AO 91 (Rev. 11/11) Criminal Complaint

**SEALED BY ORDER OF COURT**

FILED
JAN 21 2021
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
SAN JOSE OFFICE

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| United States of America | ) |
|---|---|
| v. | ) |
| Felipe Alfonso Contreras, and Diane Aguilar a.k.a. Diana Aguilar, | ) Case No. **CR 21 70088 MAG** |
| Defendant(s) | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __Dec. 17, 2020, to Jan. 5, 2021__ in the county of __Santa Cruz__ in the __Northern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(C) | Conspiracy to distribute and possess with intent to distribute methamphetamine<br><br>Penalties: Maximum 20 years imprisonment; minimum 3 years and maximum lifetime of supervised release; maximum $1,000,000 fine; $100 special assessment |

This criminal complaint is based on these facts:

See affidavit of DEA Special Agent Erik A. Wolf, attached hereto and incorporated by reference

☑ Continued on the attached sheet.

Approved as to form _Sarah C. Griswold_
AUSA Sarah Griswold

/s/ Erik A. Wolf
*Complainant's signature*

Erik A. Wolf, Special Agent, DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: January 21, 2021

*Judge's signature*

City and state: San Jose, CA

Nathanael M. Cousins, U.S. Magistrate Judge
*Printed name and title*

| Print | Save As... | Attach | Reset |



## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Erik A. Wolf, hereby duly sworn, declare and state:

### INTRODUCTION

1. I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2. I make this affidavit in support of a Criminal Complaint charging **Felipe Alfonso Contreras** and **Diane Aguilar a.k.a. Diana Aguilar** each with conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C).

3. The facts in this affidavit come from my personal observations, my training and experience, information from records and databases, and information obtained from other agents and witnesses. In addition, where statements made by other individuals (including other Special Agents and law enforcement officers) are referenced in this Affidavit, such statements are described in sum and substance and in relevant part. Similarly, where information contained in reports and other documents or records are referenced in this Affidavit, such information is also described in sum and substance and in relevant part.

4. Because this Affidavit is submitted for the limited purpose of establishing probable cause for a criminal complaint, I have not included each and every fact known to me about this case. Rather, I have set forth only the facts that I believe are necessary to support probable cause for a criminal complaint.

### AGENT BACKGROUND

5. I am a Drug Enforcement Administration (DEA) Special Agent currently assigned to the San Jose Resident Office (SJRO). As a Special Agent with the DEA, my investigations focus on large-scale narcotic offenders. I have been employed by the DEA since March, 2012. Prior to being assigned to the SJRO, I received seventeen weeks of specialized training at the DEA Academy in Quantico, Virginia. This training included several hundred hours of comprehensive, formalized instruction in, among other things, basic narcotics investigations, drug identification, detection, interdiction, United States narcotic laws, financial investigations and money laundering, identification and seizure of drug related assets, undercover operations, and electronic and physical surveillance procedures. I also attended DEA's Clandestine Laboratory enforcement school, focusing on investigations involving clandestine labs.

6. I have participated in numerous narcotics and financial investigations either as the case agent or in a supporting role. I have executed and assisted in the execution of numerous federal and state search warrants that resulted in the arrest of suspects and the seizure of money and narcotics. I have also interviewed drug dealers, users, and confidential sources, and have discussed with them the lifestyle, appearances, and habits of drug dealers and users, the use and

1

meaning of coded language, and the concealment of assets. I have also participated in other aspects of narcotics investigations including, but not limited to, undercover operations, conducting physical and electronic surveillance, controlled deliveries, execution of warrants, and arrests. I have monitored meetings and consensual telephone conversations between drug dealers, confidential sources and undercover agents and have participated in physical surveillance of narcotics traffickers. During these surveillances, I have personally observed narcotics transactions, counter-surveillance techniques and the methods that narcotics traffickers use to conduct clandestine meetings.

7. As a result of my training and experience, I am familiar with how various drugs, including crystal methamphetamine, are used and the typical distribution and trafficking methods used by drug dealers and traffickers. I am also familiar with the various methods generally used by traffickers to transport drugs in and through the state of California.

8. I have also had discussions with other law enforcement officers and cooperating individuals about the packaging and preparation of narcotics, methods of operation, and security measures which are often employed by narcotics traffickers.

9. I am familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, coded or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations, in part due to other agents' experience and my involvement in past wiretap investigations.

## APPLICABLE LAW

10. Title 21, United States Code, Section 846 makes it unlawful to knowingly conspire to distribute and possess with intent to distribute controlled substances, including methamphetamine. Methamphetamine is a Schedule II controlled substance.

## STATEMENT OF PROBABLE CAUSE

11. On December 17, 2020, a DEA Task Force Officer, acting in an undercover capacity (hereinafter, the "UC"), communicated by telephone with Diane Aguilar about purchasing a kilogram of methamphetamine.[1] At approximately 2:17 p.m., the UC called Aguilar and asked for the prices for "house keys" of "ice." Based on my training and experience and conversations with the UC, I know that narcotics traffickers commonly refer to kilogram quantities as "keys," short for kilograms, and to methamphetamine as "ice." At approximately 5:08 p.m., Aguilar texted the UC, "5800." At approximately 5:09 p.m., Aguilar texted, "Need to let him know if your interested he's picking up his house keys today." The UC did not arrange a purchase.

12. On January 3, 2021, the UC texted Aguilar to ask if she had "ice" (methamphetamine) and ask for a price. Later that day, Aguilar responded with "5800." Based

---

[1] All telephonic communications set forth herein between the UC and Aguilar were recorded.

2

on my training, experience, conversations with the UC and reviews of the conversations, I believe that Aguilar was referring to $5,800 for a kilogram of methamphetamine.

13. On January 4 and January 5, 2021, the UC and Aguilar texted to set up a meeting time for the methamphetamine transaction in Watsonville, California.

14. On January 5, 2021, at approximately 1:45 p.m., agents established surveillance at the location where Aguilar told the UC she worked in Watsonville, California. At that time, agents saw a gray Chrysler PT Cruiser registered to Diana Aguilar. At 1:45 p.m., agents also established surveillance at a second business in Watsonville, California.

15. At approximately 1:54 p.m., the UC texted Aguilar that the UC was at the second business. At approximately 2:09 p.m., the UC called Aguilar. During that call, Aguilar said she was just getting off of work and agreed to meet the UC at the second business.

16. At approximately 2:12 p.m., surveillance agents saw a red Chevrolet Suburban registered to Felipe Alfonso Contreras arrive in the parking lot of Aguilar's work and park next to the PT Cruiser. Shortly thereafter, agents saw Aguilar get into to the driver's seat of the PT Cruiser, then saw the Suburban depart followed by the PT Cruiser. At approximately 2:16 p.m., Aguilar texted the UC that she was on her way, then called the UC. During that call, they discussed meeting at the UC's location. Aguilar said that she was in a PT Cruiser, and "the guy" was behind her. Aguilar said she had recently given him $700, and then another $500 for his rent, and that he was Aguilar's brother-in-law. Aguilar said that she had offered to take "it" (the drugs) to the UC, but that the brother-in-law had to go somewhere so he said he would follow Aguilar. The UC asked Aguilar how much she had told the brother-in-law he would receive, and Aguilar confirmed "58." The UC said he would give Aguilar some money for the introduction, and she agreed as she wasn't going to make any money from the sale.

17. At that time, the UC and surveillance agents saw the PT Cruiser park next to the UC's vehicle as the Suburban parked in the parking lot nearby. The UC and Aguilar made small talk, and then the UC asked if the source had it. Aguilar said that he wanted her to count the money first. The UC asked where he was, and then walked over to the Suburban with Aguilar. The UC knocked on the passenger door of the Suburban and the driver, subsequently identified as Felipe Alfonso Contreras, unlocked the door. The UC asked "58?," and Contreras affirmed. Contreras then reached into the back and pulled a brown paper bag from a black bag. Contreras handed the paper bag, which contained a Ziploc bag with a white crystalline substance (later determined to be the suspected methamphetamine), to the UC. Contreras told the UC that Contreras recently found a new drug source of supply who has three different kinds of methamphetamine, but Contreras only worked with the higher grades. Contreras said it was always guaranteed, and the UC could exchange the drugs if the UC didn't like them. The UC then handed $5,800 in OAF to Contreras.

18. The UC asked Contreras about the prices, and Contreras said if he and the UC went in together with Contreras's source, they could get the drugs cheaper depending on how much they get. The UC offered to source Contreras drugs when the UC's source came back in the country, and said that Contreras's price was a little high. Contreras told the UC to give

3

Aguilar a call to set it up. The UC asked for a price for "5" and Contreras asked what price the UC usually paid. Contreras then told the UC that he usually picks up "3," sometimes "4." Based on the context of the conversation, I believe the UC and CONTRERAS were referring to kilogram units of methamphetamine. Contreras said he would ask. They joked about the quality, and the UC asked Contreras his name. Contreras said "Joe," and the UC left with the drugs.

19. The UC and Aguilar then walked over to the UC vehicle. The UC gave Aguilar $100 in OAF. Shortly thereafter, the Suburban, driven by Contreras departed. Aguilar departed in the PT Cruiser, and the UC departed in the UC's vehicle.

20. Later that day, I weighed the suspected methamphetamine, which weighed approximately 998.0 gross grams. I field-tested the suspected methamphetamine, which tested presumptively positive for the presence of methamphetamine.

## CONCLUSION

21. Based on the foregoing, I hereby assert that probable cause exists to believe that **Felipe Alfonso Contreras** and **Diane Aguilar a.k.a. Diana Aguilar** violated 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C).

/s/ Erik A. Wolf
ERIK A. WOLF
Special Agent
Drug Enforcement Administration

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this 21st day of January 2021. This complaint and warrants are to be filed under seal.

THE HONORABLE NATHANAEL M. COUSINS
United States Magistrate Judge

4